James v. Warden, Mr. Van Winkle May it please the Court, Your Honor, this is my first appearance in the 11th Circuit, and it's my understanding that this Court is likely to be active in its questions. I was going to begin by discussing the performance problem of Strickland, but if the Court has specific questions or other areas you prefer that I address first, I'm happy to do that. Welcome, first, for your first appearance. Thank you. Generally, we have 30 minutes aside, which is more than we allot in non-capital cases. I understand. We all generally just let the attorney run with it, and then we will interrupt with questions when so inclined. Thank you, Your Honor. We have read and are familiar with your brief, and if we don't ask questions about some of the strong points and about some of their strong points, it's for that reason. I understand. Well, Your Honor, I'm going to try and focus on matters that are not necessarily covered by the brief. And I wanted to focus on, I mean, I think it's obvious that one of the biggest questions in the case is, was Mr. James uncooperative or obstructive in dealing with counsel? And does the law permit counsel to escape ineffective assistance of counsel charges or claims on that basis under the circumstances in this case? I think the answer to that is no. And I think one point I wanted to make that's not really covered in the brief is that counsel really doesn't need the cooperation of the defendant to conduct a mitigation investigation. It's obviously helpful if the client will give you names of people to contact, but here it appears that Ms. Vinson was waiting for Mr. James to give information, and until he did, she wasn't going to conduct an investigation. And that's not the way it works. Every mitigation investigation begins with record collection. Since you've basically given me license to do that, let me tell you, and I'll always, not always, but regularly do this. It's not a predisposition for a decision, except it's an inclination to tell counsel where I think the weak point of their argument is. Because you don't need to discuss the strong point, which is that counsel ought to do investigations, inform the client, and so forth. But it seems to me that the weak point is on prejudice. Because we've held in Gilrath and Pope, and it's consistent with Supreme Court decisions, that because the burden of showing prejudice is on the petitioner, he has to put in evidence that if he had been fully informed, he would have said, yes, I want you to present that evidence in mitigation. And here's the problem on these facts. As I understand it, you all had the state evidentiary hearing. I know you did. And you either introduced or proffered the evidence in mitigation that counsel should have found and should have put in had the petitioner allowed them to do so. But I can't find any reference in your brief, and I have not read the whole state court record. But no reference in your brief where there was any evidence at all to indicate that the petitioner would have allowed that had he known it. Now, he sits there during the state evidentiary hearing and hears all that evidence and is aware of it and could have taken the stand and testified, gosh, if I had known that, I would have said, yeah, put it in. But you don't indicate that he did that. And in fact, of course, the record shows he didn't testify at all. That's true, Your Honor. Part of the reason for that is that he wasn't there. There had been a mix-up on the morning of the hearing. We had expected that the transportation people in the Department of Corrections would have transferred him to the Jefferson County Jail and that we could bring him across the corridor into the courtroom. But we all discovered on the morning of the hearing that he was still down at Holman Prison. So it was… Where was the hearing? The hearing was in Jefferson County at the courthouse, a relatively new courthouse. Did you ask for a continuance to get him there? We discussed with both of the attorneys general, and the judge and I huddled in the judge's chambers and discussed the matter. And I called Mr. James as well. And what we ended up doing, and this is set forth at the very beginning of the reporter's transcript of the evidentiary hearing. Because we had a great many people who had been subpoenaed and were ready to go, we ended up setting up a conference call system. There was a conference call speakerphone that was used. I believe it was part of the judge's equipment or somehow it was in the courthouse. But that was set up to permit him essentially to appear telephonically in the argument. There were a couple of points at which he complained that he was not able to hear witnesses. He was able to hear the lawyers and the judge pretty well, but there were witnesses, particularly social history witnesses, he could not hear very well. In between witnesses and sometimes before I dismissed a witness, such as Ms. Vincent herself, I went into the judges. We took a break and I went into the judge's conference room by myself after muting the phone so that not everyone would hear what we were talking about. And had a private conversation with him to see if there were additional matters that he wanted to bring up. But I don't think realistically there's any way I could have put him on as a witness by telephone. I'm not even sure under Alabama law if that's permissible. But you didn't ask as far as I know. Well, I suppose I could have delayed or requested a continuance so that he could appear personally. Or you could ask for that hearing to go forward and then have him testify separately later. Did you do that? I did not. During the conversation, and I apologize, this is my recollection, our conversations in the judges chambers when we discovered that he was still down at Holman Prison, I don't believe are on the record. But it's my recollection that we discussed all of the various options. There was some discussion of bringing him up separately. There was discussion of simply moving the whole thing back, which I think would have been my preference. But we had, again, a number of witnesses who had been subpoenaed who were there. That works for not moving the whole thing. But I'm still a little puzzled as to why you didn't ask the judge to let you bring the witness in front of the judge and the State at a later date and testify. Your Honor, at this point, it's been 15 years, and I don't want to make a misstatement to the court. I do remember that we discussed all the options that occurred to me, the Attorney General or the judge. And this seemed to be the least bad one, I guess. And I'm not badging you about it, but if it's not in there, I just want to make sure you didn't attempt to submit an affidavit from your client. I did not, Your Honor. I'll add one other factor here. That is, we were granted discovery in, I believe it was late March, and the hearing took place on June 8th. It took some time after we were granted discovery for us to get records from the Department of Corrections and other sources. So it was late May by the time we actually had – or mid-May, I think, by the time we had records from the prison and elsewhere. And it was the very end of May before I had the affidavits of the psychiatrist and the neuropsychologist. But at that point, by the time we got to the hearing, I was aware that there was substantial evidence that the client had possible thought disorder, which is the kind of central characteristic of schizophrenia and psychosis. Both – as I understand it, both hallucinations and delusions are kind of come-and-go, wax-and-wane conditions. But thought disorder is always there if the client is psychotic or schizophrenic. So that was troubling. And then in addition, we had records of an evaluation by the prison that showed schizoid thought characteristics. And there was a lot of other evidence – I don't want to repeat all of it, but much of it is in the briefing – all of which suggested that the client had mental difficulties. And I think that may have influenced a great many things in the case, including his ability to cooperate with counsel, all of that. But it also, I think, would have affected my desire to – or decision as to whether or not to put him on. You had good reason not to put him on, but still the burden is on the petitioner to show that he would have testified had he known that. Of course, if he gets on the stand and says, no, I don't want any of this, I like being on death row, et cetera, you know, your nightmare case, that's a danger. But we're presented with no evidence to contradict their assertion and, as I understand it, the findings that he didn't want any mitigation or he told the attorneys that. Well, my view of the record is somewhat different, Your Honor. I think that it's clear to me that much of the evidence or the testimony that was given by lead counsel regarding cooperation or his supposed obstruction, in fact, contradicts her own notes. I've discussed, I think, at some length in the briefing the fact that her own notes of her first visit show that he was completely cooperative, that he gave her the entire story of what had happened. I know, but you also had the junior counsel say, I've talked to him many times. That's true, but junior counsel, by his own admission, was not involved in the mitigation investigation at all. But he was involved in trying to get Mr. James to oppose the death sentence. For example, during the plea negotiations, got him a life sentence offer, and he said, I've talked to him many times, and he's told me that it's better to be on death row than in the general population in Alabama, which is not a fantastic assertion from what we understand. It is not, Your Honor, but I guess one of the critical questions is when did that supposed conversation take place? It looks to me as though he was cooperative throughout. Trial counsel's notes, if he were so uncooperative that he was going to obstruct the presentation of the mitigation investigation, you would think counsel would have notes in the file, a memo to file or something that would support that. Your Honor. Don't you think there's a difference between a defendant who's perfectly willing to cooperate during the merits phase of the investigation in terms of obviously would prefer to be found not guilty, but then once he is found guilty, could give an instruction for reasons that, as Chief Judge Karn said, could make some sense to people that he would prefer to be in one prison setting rather than the other? Well, I think what the ABA guidelines and the NACDL guidelines and other sources say is that when you encounter a client who is reticent to cooperate with or obstructs or is not cooperative with a mitigation investigation, that should set off alarm bells in counsel's head because that suggests that maybe there is something wrong or there's some mental deficit in the client that needs to be investigated. So that statements like that really should trigger a greater duty to investigate rather than a lesser one. Do you see a difference between being uncooperative with an investigation and giving a specific instruction to your counsel? Well, I think the law, the United States Supreme Court law, particularly Ron Pillow v. Beard and Porter v. McCollum, pretty clearly say that even when counsel or even when the defendant is giving counsel instructions, do not talk to this person, don't put that person on, counsel nevertheless still has an obligation to conduct a mitigation investigation. I think if, I mean, we don't know to what extent he even understood what a proper mitigation investigation looks like. There had never been record gathering, so counsel was not aware of any of the mental health issues that I think needed to be taken into account in deciding whether to proceed or to what extent to follow his instructions. Let's say we agree with you that a mitigation investigation should have been done and wasn't done and could have even borne a lot of fruit. How do we get past the prejudice problem? Do you have any evidence? I've not seen really any, frankly, but do you have any evidence that Mr. James would have permitted counsel to enter whatever robust mitigation evidence they had been able to come up with had they done the appropriate investigation? Well, my view of the law is that the situation is really reversed. Until counsel has done the investigation that needs to be done, we can't look to what the client says about a non-investigation. If counsel has no investigation, no witnesses, no strategy for the penalty case, has done no record gathering, then there's nothing for the client to obstruct. There's nothing for him to refuse. Right, but how about assume that my question has to be answered. I'm sorry, I don't mean to. I'm not dumping the question. I'm a little long-winded perhaps, but I think you can't look at what a client says about a non-investigation and say, well, he would have obstructed if we had done the investigation. That lets defense counsel completely off the hook. You can't say, well, we decided we're not going to put his sister up. How does it let them off the hook? In comes capable and dedicated state collateral counsel who puts in the evidence that would have been found and then puts the petitioner on and says, if I'd known that, I would have said, sure, put all that on. That doesn't let them off the hook. See, here's the problem I have. If you've got a defendant who tells and begs counsel to find some mitigation and counsel does nothing, that's not considered structural error, which obviates prejudice. You have to show that if counsel had done his duty and done a competent investigation, a thorough investigation, there would have been evidence that as a result of which there's a reasonable probability of a different result. So even if there had been no instruction, you're focusing on weaknesses in the state's assertion that there was an instruction. And that's fine, but you've got to show that if the counsel had done a thorough one, he would have been able to present it and there would have been, maybe I'm missing something here, but I just. Well, Your Honor, I think one thing is, I mean, we put on an evidentiary hearing. I went down and spoke with him. We did a lot of investigating to the extent that we could, given the restrictions that were placed on us. And he never objected, even though he was appearing telephonically, to the presentation of all this mitigation. So doesn't that fact by itself tend to contradict the claim by counsel that he would have opposed the presentation of mitigation? Is the standard whether he would accept that mitigation evidence now, potentially as he draws closer to the imposition of the penalty, or that he would have accepted the presentation of that evidence at the time of the penalty phase? Well, I think, again, it's a cart before the horse situation. If the investigation is not done, he's not waiving anything. There is nothing to waive. There's nothing to obstruct. And I think that, under the case law, is what comes first. I think the concern, at least I'll only speak for myself, the concern is that without drawing that connection between what he would have admitted, between whether he would have permitted evidence to be admitted, I think it's harder to overcome the prejudice point. It seems like, for good reason, you're remaining on the performance prong, but it seems harder to establish prejudice if we don't see any evidence that he would have actually allowed even this hypothetical evidence to be entered. Well, Your Honor, I think all of the authorities on this subject, and again, if you go back to the ABA guidelines and elsewhere and the comments on them, all of the standards, the well-defined norms that Wiggins says we look to to determine the competence of counsel and prejudice, one of the things they constantly drum into us through those is that you have to expect, and one of the reasons you have to do the investigation so far in advance is that you have to expect that if the client loses at the guilt phase, he is going to be despondent and fatalistic, might even be resistant to the presentation of evidence, but the case has to be handled correctly from the beginning. The mitigation investigation is conducted and discussed with the client throughout the case so that when and if the time comes that he loses the guilt phase, he's not going to simply give up, and that can happen if you're dealing with somebody like Mr. James, who has a history of trauma and possible schizophrenia and other issues where being sentenced to life in prison at a minimum and possibly death is a shocking experience. It's something that's going to throw—I'm sorry, I see my time is up. Should I continue? My apologies. It's going to throw anyone for a loop, even someone who doesn't have the mental health deficits that Mr. James has, and so you have to expect that in advance, and that's why the investigation is conducted the way it is. You can't say, well, we did nothing. We've gotten him to agree not to put on a penalty phase and say, well, that's a sign that he would have objected. Mr. VanWinkle, by my count, you have four minutes and 22 seconds, so you've got some time. I have a record question. At the Rule 32 hearing, you produced affidavits from two mental health professionals and tendered those affidavits. As I understood it, the court didn't admit them into evidence. Am I right about that? My recollection is that the court admitted them. Oh, okay. That was really my question. At the beginning. Now, later on, Mr. McIntyre, who is the Deputy Attorney General on the case, objected that he was getting these, or didn't object but said he was getting these late in the process and he wanted more time to respond. The judge gave him a week. After a week, he hadn't filed any response. And at the end, a couple of months later, when he wrote the decision that the judge signed, there's a lengthy footnote in which he basically described what had happened at trial on that point and then ruled in that order that the affidavits, the declarations, would not be accepted because they hadn't been provided to the Attorney General in time. Well, that was not a basis for objection at the time, and I'm not sure how the court would have known when the AG got them. But in any event, that was just one example of the many errors in the decision that I think rendered it unreasonable. What's your response to counsel's suggestion that the type of mitigation evidence that was potentially available is not the sort of thing that, in his experience, matters to an Alabama jury? Her experience? Her experience. I believe it was Ms. Jensen who said that. I think she's wrong. I think that the authorities, and particularly the ABA guidelines and the other professional sources of the standard practices of attorneys, clearly show that what you have to do at the end in the mitigation phase, in the sentencing phase, is you have a jury that at that point is asked to decide, does this person get to live or die? And if there is no mitigation phase, the jury is being asked to decide life or death on the basis solely of the worst thing this person has ever done. And you have to, and they're called monsters by the DAs. In this case, he said he's just plain mean. There's nothing good about him. You can look all you want, but you won't find anything good. Well, you have to prevent that kind of argument from being made by humanizing the defendant, showing that he is a real person, that people love him, that he has children, he's been a good parent, and they would like to grow up and know him as they get older. There's much that could be said that was very positive about Mr. James. There was also a lot of other mitigating material such as the mental health evidence that we wanted to and I think could have presented fairly easily if we'd been given a mental health expert. So I think she's just wrong. I think her response on that reflects a lack of understanding on her part about what mitigation is and why it's presented and what's going to happen if you don't. So I think that's my response. I just don't agree with it. I have one more question about the Alabama Court of Criminal Appeals opinion. The opinion keeps saying over and over that James wished that no mitigating evidence be presented on his behalf and that's just not consistent with my understanding. He said, don't talk to my family. At one point, I guess, the prosecutor asked now Judge Vinson affirmatively, did he tell you not to call any witnesses? And she said, that's right, or something to that effect. But whenever left on their own devices to characterize the request that Mr. James made, it was always that he simply said, I don't want you to talk to my family. Is that? No, that isn't. I mean, again, he was fine with my talking to all of his siblings. All of their names were listed in the pre-sentence report. But what he was fine with you doing is not the issue. Well, I understand the point Your Honor is making. But at the same time, you know, what he was asked to agree to was not putting on, it was counsel's decision not to put on his sister. She made that clear because there were three stories that she had to tell that reported prior violent incidents. And they were relatively minor. He got in a fight at juvenile boot camp, for example. But on that basis, counsel did not want to put her on. And then my client's mother didn't want to testify. And I think that was largely because, and I don't want to go too far outside the record here, but she was married to a man named Donald Wayne Cook, who had a record as long as your arm. He had been sentenced to 15 and 18 years. Counsel was actually talking about putting him on the stand at one point. I believe the night before the penalty phase and did not even know that, you know, what would have happened if they had put this person on the stand to testify in mitigation. So, to me, it seems that he did want his sister to testify. He didn't want his mother to testify. But that's not his whole family. He would have loved to have had Mara Ruffin testify and his five siblings, his two daughters, he was very proud of. And, you know, it would have been nice to have them at least in the courtroom sitting there as kind of mute witnesses to the fact that he was a parent. But do you have any evidence that was his wish at the time of the sentencing trial? I think the short answer to that is no. But, again, I think the authorities pretty clearly say that you can't wait until the end after a guilt phase verdict comes down when he's going to be disbonded. And it's deficient performance if you do. And then you turn to prejudice. That's true. Let me, and I'll save this till last because I didn't want it on your time because it's more. You say in footnote five, no United States Supreme Court decision, appellant is found suggest a reviewing court conducting strictly in prejudice analysis may properly consider the number of jurors that would have needed to change their verdict in order for the defendant to prevail on his claim. In other words, you're talking about the district court's decision that the evidence would have had to change the minds of at least three jurors and you say it's an objective test, not an idiosyncratic jurors test and that kind of stuff. My comment to that is would that it were so. The Supreme Court in our court has, to my consternation for years, said with Georgia, for example, and with the statute under consideration of Wiggins, if you've got a unanimous verdict requirement to give death and otherwise it's life, all you've got to show is at least one would change their mind. Well, reasonable probability of a different result doesn't mean given these 12 jurors. The Supreme Court said that in Agers, which established reasonable probability of different result standard for Brady and it was carried forward and so forth and so on. But we have persisted in saying that. Someone perhaps should say to the contrary, not that it would do any good. A lot of salt has been shoveled since then. But I suggest your better argument there is regardless of the test, you don't have to have seven like the district court said because Alabama statute requires ten or more for a recommendation of death. And if in this case three had changed their mind, there wouldn't have been a recommendation of death. That's true. But you don't have to have seven. You don't have to have a recommendation of life because it's a reasonable probability of a different result. The different result at the jury phase would have been either a hung jury or whatnot, which is a different result from an advisory verdict on the thing. But I share your view of what ought to be the analysis. Well, thank you, Your Honor. The source of that discussion in that footnote was really this court's own grant of the certificate of appealability, which pointed out in fact the error of the district court on that point. And I also wanted to make the point that I think if one juror would have changed his mind, I think it's true that you can't really say, well, only one juror would have changed their mind. I understand the Eleventh Circuit law is the Eleventh Circuit law, but nevertheless, just as a matter of logic, unless we can inquire into the mental processes of jurors, which we're not permitted to do. All of which is why it ought to be a objective standard that the judiciary projects onto a hypothetical reasonable juror, a reasonable jury, rather. But thank you. We'll give you five minutes on reply. Thank you, Your Honor. Ms. Curtis, 30 minutes, if you need it. Chief Judge Carnes, may it please the Court. I represent the state of Alabama, and unless Your Honors have a different preference, I'll start with talking about the instruction that the defendant gave the counsel, close to where you left off with my friend on the other side. So, Judge Martin, you asked specifically if there was any evidence of him, of Mr. James giving his counsel instruction not to present mitigation evidence. No mitigation at all. Yes, Your Honor, as opposed to simply instructing them not to involve his family. And I wanted to clarify for the record that there is in her notes from the time of trial, which have been relied on. Ms. Vinson. Ms. Vinson's notes, yes, Your Honor. This is at volume 21, page 2760. And she writes in her notes, and this is from June 16, 1999. I asked him what mitigating evidence I could use, and he said none. And so there is actual evidence in her notes that he said she could not present any mitigating evidence. Yes, I just read that differently. I mean, he's not charged with doing her investigation for her. I mean, maybe he understood her to say, do you have any mitigation for me to use? And his answer was like, not on me or whatever. But anyway, I understand your point. I had seen that, so thank you. Yes, Your Honor. And I see how you had read it like that. However, it's also a reasonable way to read it to say that he did understand what she meant when she said, can I please present. So this was after the guilt phase. So Alabama law says that all relevant evidence is admissible for purposes of mitigation, doesn't it? Yes, Your Honor. Yeah, okay. So even if he hadn't allowed them to call witnesses, there could have been documentary evidence submitted, right? That is true, Your Honor. However, the statement here is not about witnesses, and that's why I pulled this one up. I understand. So that's it. I mean, that's the one thing you say that absolves them of putting up any mitigation evidence. No, Your Honor. That is just one fact in the record that makes it the state court's determination that the counsel were instructed not to present mitigation evidence reasonable. There's also Mr. Warren's testimony, Ms. Vinson's testimony. There's the refusal of the plea deal that would have given him life without parole, and he refused that plea deal after already having been tried and convicted of the crime once, sentenced to death once, against his attorney's advice, and in light of overwhelming evidence, three eyewitness testimony, that he had, in fact, killed Ms. Hall. And so this Court's held that the rejection or the preference for death is evidence that he would not have allowed mitigation evidence to be presented. Can I ask you, when did, in your view, did the mitigation investigation begin? I would say the mitigation investigation began six months before trial. And that's based on the conversation between Ms. Vinson and Mr. James' mother? That's based on her calling both the grandmother and calling the mother. She initiated this. So the statement by my friend on the other side that Ms. Vinson was waiting for information and didn't do anything to start until she got that is incorrect because she actually initiated conversations with the mother and grandmother before she had even met with Mr. James. We're not sure whether the mother called Ms. Vinson or Ms. Vinson called the mother, are we? The record seems fairly clear in her notes. And this is at volume 21, page 2747. She writes in her notes, and this is on December 29, 1998. She writes in her notes that she called the mother, and at this point the mother did not pick up. But she did initiate that call, and then she called the grandmother that same day, and the grandmother picked up, and she had a conversation with her. The grandmother wouldn't give any information out, but the grandmother did offer to try to contact the sister for the counseling. What other mitigation investigation was done at that time? Just the two phone conversations? So in those two weeks, the only thing we have specific dates for are those two phone conversations. However, after she met with the client, the client told her repeatedly, and Mr. Warren testified to this, not to contact his family, and the preclusion of contacting the family when a client says it can't be ignored. But besides contacting the family, she also looked up the criminal records of the victim. She looked up the criminal records of all the witnesses, and she looked over the files. She had the entire attorney file, including discovery, the pre-sentence investigation report, and the mental health evaluation from the first trial where he was also convicted, and she looked over all of that. And through all of that information, no red flags were raised. For instance, the mental health evaluation that was done shortly after the crime was committed showed that this defendant had an IQ of 102 and stated that there were no signs or symptoms associated with any major psychiatric disorder. The mother and the grandmother did not mention any signs of mental illness, and the petitioner never exhibited any signs of mental illness. And so based on that investigation, Ms. Vincent and Mr. Warren reasonably concluded that a further investigation into mental health would not be necessary. They didn't look at the prison records, did they? They did not because they reasonably concluded that based on the mental health evaluation by a neutral third party, that was not necessary. There would be no mental health mitigating evidence. And also... What kind of picture did Mr. Warren, as the one that ultimately gave the opening or whatever, opening and closing, I guess, on the penalty phase of the trial, right? Not exactly, Your Honor. No opening statements were issued in the penalty phase of the trial. There were only closing statements. The only statement that was made was made by Mr. Warren. Yes, Your Honor. Okay. And he says, I'm not going to try to tell you that Mr. James is sympathetic. Right? I mean, that's a quote pretty much, isn't it? He says something to that effect, Yes, Your Honor. I don't remember the exact words. He does try to describe, he essentially says, I think, that he was not going to try to say that Mr. James had not done anything wrong. But he does plead that they don't impose the death penalty, and he does that. Their theory was mainly that this was a crime of passion. I'm not going to tell you that Mr. James is a sympathetic defendant, period. I mean, that's what he said. Yes, Your Honor. I trust that. He definitely said things to that effect, and I believe, if you're reading from the record, that is what he said. And so there... So in your view, does he have any obligation to try to paint Mr. James as a human being or sympathetic in any regard? I do believe they do have a mitigation strategy that was reasonable under the facts of the case, and that strategy was to say that he was emotionally immature and couldn't handle the breakup. I think that given the instructions that the petitioner gave them not to present mitigation evidence, which is clearly supported by the record. For instance, we talked about he refused a plea deal to get life in prison without parole, which is strong evidence that he wanted the death penalty. Mr. Warren's testimony that he multiple times told him that he wanted the death penalty over life in prison without parole and that he was sabotaging his case to get that. And I just want to clarify for the record, both in Petitioner's reply brief and here today in court, Petitioner stated or tried to cast doubt on those comments by saying that those aren't found anywhere in Ms. Vinson's notes and that she testified to that. However, Ms. Vinson never testified to the fact that he wanted the death penalty instead of life or that he was sabotaging his case. Mr. Warren is the one that testified to that. He's the only one that testified to that. And his credibility has never been questioned by the state court, by my friend on the other side, by anyone, and there's no reason that it should be. And so Mr. Warren's testimony, the credible testimony that he wanted the death penalty and that he told Ms. Vinson not to present mitigating witnesses, and then perhaps most strongly the record supports the idea that he instructed his counsel not to present mitigation evidence because the Rule 32 court saw a colloquy where the defendant agreed not to present mitigation evidence. And that Rule 32 judge is the same judge that presided over both trials below that convicted Mr. James to death twice below. And this court and the Supreme Court in Shiro has said that that judge who has presided over both of those trials and the Rule 32 hearing is ideally situated to determine what the petitioner meant in that colloquy. And then this court actually expanded that in Cummings and said not only to determine what he meant in that colloquy, but that judge is ideally situated to determine what he instructed his trial counsel to do. And the Rule 32 judge, after sitting over both of the trials, sentencing the defendant twice, presiding over the entire Rule 32 hearing, concluded that that defendant had instructed his trial counsel not to present mitigating evidence. And so the record – Do we know if there was mitigating evidence presented at the first trial? There was no mitigation evidence presented at the first trial, Your Honor. And so the record clearly shows that the finding that there was an instruction not to present mitigating evidence was not an unreasonable determination of the facts and deserves deference under AEDPA. I've got a hypothetical for you, and let me be clear. I know that these are not the facts of this case, so don't worry. I'm not suggesting that they are. But let's say that a defendant knew – perhaps he was a gang member – and he knew of a credible threat on his life within the general population in prison. And let's say that prison officials had said, tough luck, we don't like you, we know you're a bad guy, you're a gang member, and so we're just going to let them do whatever they want to you. That person quite credibly might decide that he preferred to be on death row for a long period of time than to be in a situation where his life was threatened in a different way. Does that impact our decision on whether his instruction to his counsel in that regard should keep counsel from showing that there was prejudice by lack of mitigation? Well, Your Honor, I think you would have to look and see if the counsel inquired as to his reasons for not wanting to be on death row, and then depending on if they asked him and if he told them it's because of the facts he laid out, and then it could be a different analysis. However, like you said, those aren't the facts of this case. In this case, the petitioner wanted to be on death row because of reasons like he had a television, he didn't have to argue about whether to watch baseball or football, he had plenty of reading material, he got treated one-on-one, and so – And less chance of being killed. He said he wouldn't have to watch his back. That was one of the facts, but that was not the only one. And Mr. Warren did discuss with him and try to – and said he did not accept it until he was very assured that the petitioner was not going to change his mind. And so I think you could have a different analysis if there were different facts, but under the facts of this case, the petitioner clearly instructed his counsel to do that. Well, what do you say in response to Mr. VanWinkle's discussion about, you know, you really can't hold someone to, you know, a general preliminary instruction, I don't want any witnesses called or I don't want my family called or whatever, when they don't even know what a mitigation case is and there's been no mitigation investigation done? What's your response? I mean, it's not an informed waiver at that point. So I would have two responses to that. First, Your Honor, in Shiro, the United States Supreme Court said that they have never required a knowing involuntary waiver not to present evidence and also in that same case said that no sort of colloquy is required. And then also – Well, there certainly wasn't a colloquy here, was there? I mean, we've got a nod of the head. Is that okay with you, Mr. James? Nod of the head. So he did, you're correct, he did make an affirmative statement that he accepted. A statement? As defined by the hearsay rules, it would be a statement. So, yes. But, so as Shiro says, it doesn't have to be knowing involuntary. And also – I mean, it would be a better practice, however, to inform Mr. James about what a mitigation case is and what they could offer. Ms. Vincent testified that she did inform him about the penalty phase and also in Shiro, the Supreme Court held that saying that you don't want the death penalty is evidence that you understand what mitigation evidence is used for. But she didn't develop the mitigation. I mean, here's the question. You gather no documents here from my understanding? No. And you didn't hire an investigator here, did you? No. Did you hire a mitigation specialist? No. A psychologist? No, sir. A psychiatrist? No, sir. A neuropsychologist? No, sir. So, you know, she didn't do a mitigation investigation. I mean, he had no idea what type of thing could have been presented to the jury. Your Honor, I'm sorry. In responding to that question, I was responding to whether they should have explained what a mitigation evidence was used for, which counsel could do without providing, presenting, I'm sorry, without doing a mitigation investigation. However, we're not here disputing that this was a limited investigation. We do think it was a reasonable determination that they did not perform efficiently because the two areas of mitigation investigation that my friend on the other side disputes were not investigated properly were the mental health evaluation and the potential mental health mitigation evidence and the social history difficult childhood evidence. I mean, this kid, you know, he left home at 16, but up until that point, he had lived in 18 different places. I mean, that's cause for sympathy on some people's part, wouldn't you think? Well, Your Honor, what I would say to that is that the petitioner, so that there were no red flags were raised that would cause a reasonable attorney to dispute. I didn't look at any records. Well, Your Honor, that's not entirely true. They did not get any more records, but there were some records in the previous case file. They also looked at the mental health evaluation, which didn't mention any abuse. Are you talking about the one from the fourth grade? You're not talking about the one from when he was in the fourth grade. No, Your Honor. I'm not talking about any record specifically except for the mental health evaluation. They also spoke to both his mother and grandmother who did not mention any abuse. And importantly, the petitioner himself didn't mention any abuse, and this court held in peyote that if the defendant doesn't mention any abuse, then the counsel has no duty to seek it further. And Ms. Vincent, who was a very experienced trial attorney, she testified that Jefferson County juries are not sympathetic to typical childhoods if there's no evidence of abuse, and so she made a reasonable tactical decision after finding no evidence, no red flags of abuse, not to pursue that line of inquiry. She said just philosophically she didn't believe mitigation evidence is effective, right? Your Honor, yes, she stated that she didn't believe it was usually effective, but she still always did present mitigation evidence and do an investigation. And as the performance test is an objective one, what she believes doesn't matter to that analysis. And here it's clear that based on the evidence she did have, that it didn't raise any red flags. She was not a reasonable attorney. At least one competent attorney could find, could have acted as she did. And in this case, the standard is that at least one fair-minded jurist could believe that at least one competent attorney might have investigated like she did, might have not sought out mitigation evidence when there was no flags, said it would be helpful. In light of his instructions multiple times, I think Mr. Warren said at least once and less, I'm sorry, more than once and less than 12 times not to involve his family, which can't be ignored, and that he was uncooperative. My friend on the other side said that there was no evidence, I think besides testimony potentially, that he was uncooperative. But in Ms. Vinson's notes, she states that he was very quiet. I asked specific questions. He would give no answer. And that's just one quote from her notes. What about the lack of presentation of any evidence that Ms. Hall had sometimes been the aggressor against Mr. James rather than purely the victim? Wouldn't that have fit within the strategy that you've suggested that they took, which is to present this as a tumultuous emotional relationship? Your Honor, so speaking to the prejudice prong, and as we've said there's two steps that he must meet in the prejudice prong. One, he hasn't met, and it's very clear. But to the second one, which would be the weighing, that could potentially weigh in favor of their theory. However, a lot of my friend on the other side never discusses the balancing and never discusses the aggravating factors. And petitioner has not met his burden of showing that the aggravating factors would outweigh the mitigating even if the Rule 32 evidence had been presented at his trial. To your earlier question, Ms. Grant, is the standard that he had to show that he would have allowed it at his trial or at his Rule 32 hearing, the standard is that he must show in the record that he would have allowed it at his trial. And he didn't. And so here, the evidence that was presented at the Rule 32 hearing, first of all, it's very weak. We've already discussed that there is some social history. There is some evidence that he had a difficult childhood. He did move a lot. His mother was absent. He had to live with family members. I mean, I think about three years in there, she wasn't even there, right? And so here he is trying to feed his five younger brothers and sisters, right? Your Honor, during those three years, his mother was not there. He lived with various family members in that time. So I don't think I would characterize it as him trying to feed his siblings. However, I would characterize it as a very difficult childhood. However, we have, so there is evidence that he had a difficult childhood. But like Ms. Vincent testified, that is not particularly persuasive to juries in Jefferson County. Moreover, the mental health. Well, how do you know if you don't try, for goodness sakes? I mean. So she had tried 30 capital cases, and it was from that experience that she stated that Jefferson County juries were not sympathetic to that type of mitigation evidence. She didn't know what it was, did she? I think she was saying that generally the evidence of a difficult childhood is not something that Jefferson County juries are sympathetic to. And so the mental health evidence was also weak. They mentioned these MMPI evaluations, and these don't make any particular findings about any testee. These simply state that people who score within this score range might have these certain characteristics. Remind me when that test was performed. There were two. There was one in 1991 and one in 1995. And the second MMPI was especially weak, and the second is a new version that is the accepted version. And that test actually said that because of Mr. James' scores, it said his scores strongly suggest that the profile is invalid. And so that makes that even weaker. Moreover, they tried to point to this one comment on an evaluation. They called an evaluation that the person had schizoid. I'm sorry, Mr. James had schizoid characteristics. This is the prison record. Yes, Your Honor. And I just wanted to point out that that comment was in the notes. So that was a 30-day evaluation. That is not done by a psychologist or psychiatrist. It's done by a licensed counselor. These are done every 30 days for all the death row inmates. They're cursory. And more importantly, there's 24 of those evaluations in the record. All of them except for this one say something to the effect of adjusting well or adjusting or stable. The vast majority say stable. And all 24, including the one where they had scrawled schizoid characteristics at the bottom, conclude that he has no significant mental health problems and no thought disorders. And so even though there's that one counselor that wrote he might have schizoid characteristics, that is also incredibly weak mitigating evidence. Red flag? Well, Your Honor, this is in the prejudice analysis. And so in the performance analysis, there was no red flags that would have caused a reasonable attorney to go farther. I mean, if the lawyer had seen the prison records and it said Mr. James has schizoid tendencies, that would have been a red flag, wouldn't it? I don't think so, Your Honor. As it was one out of 24. It was one out of 24. And she had a actual, and that was by a counselor, and she had an actual mental health evaluation by an actual psychologist who said he had no mental health problems and didn't say anything about needing further evaluation. So, no, Your Honor, I don't think that would have been a red flag. Where did that one fall in the 24? Do you know? It was in, I don't remember the exact date. I can get it for you. But it was either in late 98 or early 99. I believe it was April of 99, but it was late 98, early 99. And it is on, but I can tell you the exact date. That's okay. I can find it. Don't worry about spending your time on that. Okay. Also, the testimony at the Rule 32 hearing was double-edged. For instance, the MMPI, which they rely heavily on, as we mentioned, their theory of the mitigation was that he was emotionally immature and it was a crime of passion. This MMPI, too, found that he felt people within his score range were often free of stress, psychologically well-adjusted, and capable of dealing with problems in their daily lives, that they had sufficient personal resources to deal with problems, that they were conscientious, conventional, practical, reasonable, and sensitive. And so that would have cut strongly against their mitigation argument. And also the testimony by the sister that he had broken a previous girlfriend's arm, threatened his stepfather with a gun, and beaten up a Job Corps, his Job Corps supervisor, would also clearly cut against their mitigation strategy. Also, Petitioner hasn't shown that a competent attorney would have presented it. And so all of the evidence at the Rule 32 hearing, even if it had been presented at his trial, it was a reasonable determination to find that it would not have outweighed the aggravating circumstances. And there's strong support for that, specifically because the Rule 32 judge was the judge at both of the trials below and sentenced the defendant to death at both of the trials below. And as this Court has shown in Peyote, the sentencing judge is the final senator, the senator in Alabama's system. And here that judge has already reweighed all of the circumstances and mitigation and aggravation from the trial and the Rule 32 hearing and found that the mitigating evidence did not outweigh the aggravating circumstances. And so there's no reasonable probability that the senator would have determined that the mitigating evidence at the Rule 32 hearing outweighed the aggravating circumstances at the trial because that . . . What is your record reference for where the Rule 32 judge weighed all of the mitigating against all the aggravating? I'm sorry. That would have been in the Rule 32 order. I don't have the exact citation, but I can get it for you by the end of argument. No, no, no. It's when he says that the childhood evidence was weak and that it did not outweigh the circumstances. A few notes. Back to the very first point that was discussed a good bit with my friend on the other side. This case ends at the first prejudice question, which is, did the petitioner put on the record that he would have allowed the evidence to be presented? There was some discussion about the fact that the petitioner was on the phone at the Rule 32 hearing. However, at Volume 22, page 9, my friend on the other side says on the record that he has all his witnesses there, that he had requested a continuance, but that he had requested a continuance because of discovery issues. And there was also no affidavit entered. There are other ways to get on the record that the petitioner would have allowed this evidence to be presented, but there's no evidence of that in the record. Because there's no evidence that he would have allowed it to be presented in the record, he can't show prejudice. And Pope, just to clarify, because there was some discussion of the burden, Pope makes very clear that the burden is on the petitioner. It even says that the argument, why I wasn't asked, is bad because, and I'm quoting, that too misplaces the burden. And so, because of that, that alone is enough for the Rule 32 order to be reasonable and deserve deference under AEDPA. Also, Judge Martin, you asked if the court below admitted the affidavits, and they did not. Is the way Mr. Van Winkle described it accurate? The hearing proceeded with consideration of the affidavits, and then it was only then in the written order that the judge said, they were presented too late, and therefore I'm not going to admit them. Is that? So, the way Mr. Van Winkle presented it was not accurate. The way that it happened, and this is at volume 23, page 272, the court, he proffered these declarations. The assistant AG said, hey, today is the first time we've seen them, which would be where the court knew the first time that they had seen them. And then the court did give them a week to respond. However, Mr. Van Winkle had not disclosed certain things they needed to respond, so within that week they sent a letter to the court copying Mr. Van Winkle, and that letter is at volume 17, 1940, explaining that they couldn't. Can you give that slide again? Yeah, that was volume 17, page 1940, and explaining that they couldn't respond to the petitioners, to these declarations because they didn't have something that the court had ordered Mr. Van Winkle to disclose, and that was the motion for the funds ex parte. And so it is true that it was the order that made that first ruling, but they were never admitted. So given all of that, and especially the fact that there's nothing in the record that shows he would have allowed this evidence to be presented, and even if it had been, that it would clearly not outweigh the aggravating circumstances in this case, and that has already been decided by the Rule 32 judge, unless there are any questions, we ask you to affirm the district court rule. Thank you, counsel. Mr. Van Winkle, five minutes. I hope I don't speak too fast. There's a lot to cover, but one thing before I move on, I wanted to make the point that with regard to prejudice, Strickland states that the burden of proof on the defendant when it comes to And that was never referenced below. Just so Connor's use of probability was unfortunate in the Strickland decision. That's true. I asked her about that one time. She said she couldn't think of a better word. In any event, I wanted to make the point that none of the courts below, all of the courts below cited Chandler for the theory that you need a preponderance of the evidence with respect specifically to the performance prong. But none of them made any reference to the fact that the burden of proof is less than a preponderance of the evidence. So when we're comparing the evidence that was actually not presented in this case with all of the evidence presented in the evidentiary hearing, I think that that alters the balance substantially. And I'm not sure what less than a preponderance means exactly, whether it's 35 percent or 30 or 45, but we're not talking about a preponderance of the evidence. I wanted to briefly mention that Williams, Wiggins, Rompilla, and Porter, all four of the United States Supreme Court cases involve much more investigation on the part of counsel. Frequently they involve much more evidence actually presented. And Rompilla and Porter specifically involve instructions, Porter specifically involve instructions not to speak to particular witnesses. And yet counsel was found ineffective in every one of those cases. They're all cases from the 2000s. They were all, Wiggins in particular, is just before the hearing in this case. The criminal record, Ms. Curtis said that Ms. Vinson had the criminal records of the victim. If so, she would have seen the Brighton incident report because we found it by going to the counter at the clerk's office and looking in the computer to find criminal and civil records on all of the major players. And that's where the Brighton police report showed up, indicating that Ms. Hall had attacked Mr. James and Ms. Ruff, and while they were in their truck waiting in line at McDonald's, unable to move forward or backward, smashed the windows of their car with a tire iron. That is significant not to show the violent tendencies of Ms. Hall, but significant both for mitigation purposes and to combat the theory presented by the prosecution that Mr. James was stalking Ms. Hall. In fact, the reverse was true. And that would have made, I think, a big difference at the guilt phase as well as the penalty phase. But I find it's difficult to believe Ms. Vinson looked at the criminal records of Ms. Hall and didn't see that. The question, the court, Judge Martin, I think, covered this when Ms. Vinson asked Mr. James, what evidence can I present or what mitigating evidence can I present? Ms. Curtis indicated that statement was made on June 16th. That's the day before trial. The trial took two days. He was sentenced to death on the 19th. You can't wait that long to do a mitigation investigation, ask the defendant himself does he have any mitigation evidence to put on, and then walk away if he doesn't. And that's essentially what happened here. How is Mr. James supposed to know what's mitigating and what's not mitigating? He has no experience in death penalty trials. You can't just rely on the defendant, and that seems to have been what happened here throughout the proceedings. Ms. Vinson kept going to him and saying, well, give me some names of people to talk to. That's not how you do a mitigation investigation. This may have been a better question for your friends at the other table, but do you know when Mr. James first started having discussions with Wilson about his lack of desire to be in the general population at the prison or at the jail? I believe you mean Mr. Warren. Mr. Warren. Yeah, I don't specifically, and it's hard for me to believe that those conversations would have occurred before or at least until after the guilt phase verdict came down. I don't, you know, having looked at the files, I don't see records of a lot of conversations where that could have taken place. I don't know specifically where it was. I mean, I know that Mr. Warren and Ms. Vinson both testified that they were having difficulty with him and that he was fatalistic and wanted to stay on death row because he could watch TV. That doesn't square with the Joe James I know, but it also, you know, I don't think is a conversation that would have taken place early on. You know, based on the notes, he seems to have been very cooperative, at least until after, you know, the guilt phase verdict came down, when I agree at that point he is fatalistic and I think despondent. And I frankly, I don't blame him. I'm past my time. You're right this time. Thank you. Thank you. Mr. VanLiepel, we, the court wanted to know, your first footnote caught my attention, that you are a solo practitioner who personally provided all the funds involved, transportation of yourself and the investigation and so forth into this that went into the state evidentiary hearing. The system of justice is better for that and we commend you for doing it. Thank you, Your Honor. I appreciate that. You're welcome back in the Eleventh Circuit anytime you want to come. Thank you. Safe trip back. We'll take that case under submission. All rise.